IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JILL OLMSTED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE ILLINOIS INSTITUTE OF ART - SCHAUMBURG, INC., THE ILLINOIS INSTITUTE OF ART – SCHAUMBURG, LLC, EDUCATION MANAGEMENT LLC, and DREAM CENTER EDUCATION HOLDINGS, LLC, | ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, JILL OLMSTED, by her attorneys, the Law Offices of Colleen M. McLaughlin, complains of Defendants, THE ILLINOIS INSTITUTE OF ART - SCHAUMBURG, INC. ("IIAS INC"), THE ILLINOIS INSTITUTE OF ART – SCHAUMBURG, LLC ("IIAS LLC"), EDUCATION MANAGEMENT LLC ("EDMC"), and DREAM CENTER EDUCATION HOLDINGS, LLC ("DCEH") (collectively "Defendants"), and states as follows:

## NATURE OF THE ACTION

1. Ms. Olmsted brings this action against her former employer to recover damages for gender discrimination in violation of Title VII of the Civil Rights Act of 1991 ("Title VII") and for retaliatory discharge in violation of Illinois common law.

2. Ms. Olmsted alleges that she was terminated in violation of Illinois public policy because she complained (1) that certain male faculty members at IIAS (Mssrs. Ed Kerr, Kenan Caymaz, and John Salmen) were not qualified to teach their assigned coursework based on their lack of credentials required by IIAS INC's accrediting body, the Higher Learning Commission

("HLC") and (2) that IIAS INC was overcharging students who enrolled in "mid-quarter" classes by requiring the students to pay full price for the courses despite receiving fewer hours of in-class instruction than comparable courses that did not utilize the "mid-quarter" schedule.

3. Ms. Olmsted further alleges that her gender was a motivating factor in her discharge. Campus President, David Ray, treated similarly-situated male employees more favorably than Ms. Olmsted, and terminated Ms. Olmsted in response to her reports that male faculty members were not qualified to teach their courses; faculty members who were part of a "good ole boys club" that included Mr. Ray.

**PARTIES**

4. Ms. Olmsted worked for IIAS INC, a for-profit university located in Schaumburg, Illinois, as the Dean of Academic Affairs from approximately July 2015 until her termination on January 27, 2016.

5. EDMC owned IIAS INC during Ms. Olmsted's employment. EDMC also owned several other for-profit universities, including numerous locations of The Art Institute (such as IIAS INC). EDMC is a Delaware Corporation headquartered in Pittsburgh, Pennsylvania.

6. In or around January 2018, EDMC sold IIAS INC and the majority of its other schools to DCEH.

7. EDMC schools that were subject to the sale continued operations, but as not-for-profit universities owned and operated by DCEH.

8. DCEH operates out of corporate offices in Pittsburgh, Pennsylvania that were previously owned by EDMC.

9. On information and belief, there has been a continuity in workforce between EDMC and DCEH, similarity of jobs and working conditions, similarity of supervisory personnel, and similarity of products and services.

10. In other words, there has been a substantial continuity between the business operations of EDMC and DCEH before and after the acquisition.

11. On information and belief, the sale of IIAS INC to DCEH included all university property and operations. Through the sale, DCEH took control of IIAS INC's campus, staff, student records (including those concerning academics and financial aid), and curriculum.

12. Since the acquisition, DCEH, through IIAS LLC, has continued university operations through use of IIAS INC's campus, equipment, curriculum, staff, and marketing materials, such as IIAS INC's website.

13. There has been a continuity in workforce between IIAS INC and IIAS LLC, similarity of jobs and working conditions, similarity of supervisory personnel, and similarity of products and services.

14. In other words, there has been a substantial continuity between the business operations of IIAS INC and IIAS LLC before and after the acquisition.

15. On information and belief, Mr. Ray, the decision-maker with respect to Ms. Olmsted's termination, continues to serve as Campus President of IIAS LLC, which is the same role he held at IIAS INC.

16. On information and belief, Mssrs. Kerr, Caymaz, and Salmen all continue working as instructors at IIAS LCC.

17. DCEH knew or should have known about Ms. Olmsted's claims prior to its acquisition of IIAS INC. Ms. Olmsted alerted EDMC and IIAS INC to her claims in 2016, and this matter was pending in arbitration at the time DCEH acquired IIAS INC.

18. On information and belief, EDMC does not presently have the financial ability to pay the relief Ms. Olmsted seeks in this case.

19. On information and belief, DCEH and IIAS LLC succeed EDMC and IIAS INC in this matter and are liable for any violations of the law that were perpetrated by the predecessor entities.

## JURISDICTION AND VENUE

20. Mr. Ray terminated Ms. Olmsted from her employment at IIAS INC on January 27, 2016.

21. In accordance with the arbitration clause found in her employee handbook, Ms. Olmsted initiated arbitration proceedings against IIAS INC, as an operating unit of EDMC, on June 27, 2016. The dispute originally involved only a claim of retaliatory discharge in violation of Illinois common law.

22. Ms. Olmsted filed a charge of gender discrimination with the EEOC on November 18, 2016, at which time the arbitration proceedings were stayed by agreement of the parties pending resolution of the EEOC investigation.

23. The EEOC issued a right to sue letter on May 17, 2017.

24. Within ninety (90) days thereafter, on August 10, 2017, Ms. Olmsted reinstated her demand for arbitration to pursue her claims of common law retaliatory discharge and gender discrimination.

25. Pursuant to the terms of the arbitration agreement, other than a one-time payment of a fee equivalent to the current court filing fee, EDMC was responsible for paying the cost of the arbitration proceedings.

26. Ms. Olmsted paid her portion of the arbitration cost.

27. In April 2018, before the arbitrator had held a hearing on the merits of Ms. Olmsted's claims, EDMC informed the arbitrator that it anticipated filing for bankruptcy and would not be paying the cost of the arbitration.

28. DCEH and IIAS LLC have refused to join the arbitration proceedings.

29. Ms. Olmsted now brings the instant action against EDMC, IIAS INC, and the successor entities, DCEH and IIAS LLC.

30. This Court has jurisdiction over these claims under 28 U.S.C. § 1331 because Ms. Olmsted's claim under Title VII pertains to laws of the United States over which the Court has original jurisdiction. This Court has supplemental jurisdiction over Ms. Olmsted's common law claim pursuant to 28 U.S.C. § 1367. Additionally, to the extent Ms. Olmsted seeks declaratory judgment on certain issues in this matter, jurisdiction is proper pursuant to 28 U.S.C. § 2201(a).

31. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and § 1391(c) because the acts and omissions giving rise to the cause of action arose and occurred in the Northern District of Illinois.

## **FACTS**

32. Ms. Olmsted began her career at EDMC in May 2012 as an Associate Dean of Academic Affairs at The Art Institute of St. Louis.

33. Over the next three years, Ms. Olmsted consistently received positive performance reviews for her work with the St. Louis, Missouri campus.

34. In or about July 2015, Ms. Olmsted accepted a promotion to Dean of Academic Affairs at IIAS INC and relocated to Illinois.

35. Ms. Olmsted joined IIAS INC during a turbulent time within the university. EDMC, including IIAS INC, was entangled in a nationwide class action lawsuit arising under various state and federal false claims statutes that involved allegations of improper recruiting practices and purported misrepresentations made to various state and federal agencies in conjunction with applications for education funding.

36. Student enrollment was down and the IIAS INC faculty department had been downsized.

37. Ms. Olmsted jumped right into her new position and immediately began making changes within Academic Affairs intended to improve the quality of education provided by the university.

38. During her first few months as Dean, Ms. Olmsted reported to interim Campus President Ms. Jamie Carson. Ms. Carson had no complaints regarding Ms. Olmsted's performance, and never questioned her ability to lead the Academic Affairs department.

39. In or about November 2015, EDMC settled the class action litigation for $102.8 million.

40. On information and belief, as part of the settlement, EDMC agreed that it would not make misrepresentations to students or public entities concerning accreditation.

41. In or about November 2015, the HLC put IIAS INC on notice that it was at risk of being out of compliance with one or more criteria for accreditation.

42. In or about November 2015, Mr. David Ray assumed the role of Campus President at IIAS INC, where he became Ms. Olmsted's direct supervisor.

43. Mr. Ray had previously served as Campus President of IIAS INC, and was familiar with many of the male instructors with whom he had worked during his previous tenure at the campus.

44. From Ms. Olmsted's perspective, Mr. Ray appeared to quickly assemble a "good ole boys club" that included Mr. Ray and a number of male faculty members, including Mr. Kerr.

45. Mr. Ray would socialize with these male faculty members outside of work, and would engage in friendly, personal conversations with them while on campus.

46. The male faculty members had direct, open access to Mr. Ray, and often would spend time in Mr. Ray's office, even though the management structure included two levels of supervisors (including Ms. Olmsted) between the faculty and Mr. Ray.

47. In contrast, Mr. Ray rarely communicated with Ms. Olmsted, his direct subordinate, and, when he did, his communications were abrupt and superficial.

48. The same male faculty members who were part of the "good ole boys club" were critical of Ms. Olmsted for attempting to change their way of doing things at IIAS INC, and eluded to the fact that she is a young woman to support their opinions that she was not qualified to run the academics department or give them instructions on how to better do their jobs.

49. Beyond experiencing direct interactions of this nature with the male faculty members, Ms. Olmsted also heard from program directors (who stand between faculty members and Ms. Olmsted in the reporting structure) that faculty were upset about changes that she was trying to make in the department at least in part because she is a young woman and therefore, they assumed, incapable of effectively leading the group.

50. Additionally, after an office holiday party ended, the "good ole boys club," including Mr. Ray, sat together at tables and engaged in loud, boisterous conversation while Ms.

Olmsted was left to clean up the entire room on her own. She was required to pack everything up and carry it out to her car on a cold and icy day.

51. Even though she had bags slung over both shoulders and boxes under each arm, neither Mr. Ray nor his group of male faculty members offered to help.

52. This experience was very degrading for Ms. Olmsted in that she, as the only woman in the room, was expected to do all the cleaning while the men sat around chatting.

53. As Dean, Ms. Olmsted was expected to ensure that IIAS INC met and maintained the requirements for accreditation with the HLC.

54. One such requirement was that IIAS INC employed faculty who were properly credentialed to teach their respective courses.

55. In late November 2015, Ms. Olmsted began collecting the resumes of certain faculty members for use in applications to the HLC for new programmatic accreditation (IIAS INC must show in its application that it has faculty members who are qualified to teach the proposed curriculum).

56. While completing this assignment, Ms. Olmsted noticed that the credentials of certain faculty members did not align with the coursework they currently taught at the university or with the coursework for which IIAS INC was seeking accreditation.

57. For example, Mr. Kerr taught animation classes at the university, but his education (bachelor's degree in music and master's degree in adult education) does not reflect the technical expertise necessary to teach this coursework per HLC credentialing requirements.

58. While Mr. Kerr purports to own an animation company, Ms. Olmsted doubted the validity of his professional experience based on student survey results from the Fall 2015 quarter

that contained poor ratings from his students and student feedback that suggested he does not understand modern animation software.

59. In Ms. Olmsted's assessment, Mr. Kerr similarly was not qualified to teach courses on the subject matters identified in IIAS INC's programmatic accreditation requests.

60. Ms. Olmsted identified similar issues with the credentials of instructors Kenan Caymaz and John Salmen.

61. On information and belief, if these instructors were not qualified to teach their current or prospective courses, then presenting them to students, the government, or the HLC in a contrary light would violate the terms of the settlement agreement EDMC effectuated with the State of Illinois as part of the class action settlement.

62. Further, if IIAS INC were to allow unqualified faculty members to teach courses for which its students receive educational grants from the state or federal government, it could be exposed to liability under the state and federal False Claims Acts ("FCAs").

63. Under the FCAs, it is unlawful, when seeking payment of government funds, to knowingly present a false or fraudulent claim for payment or approval or to knowingly make, use, or cause to be used a false record or statement material to a false or fraudulent claim.

64. When applying for educational grants, IIAS INC must certify that it meets all of the eligibility requirements for this program, including that it meets and maintains standards of accreditation.

65. If IIAS INC faculty members are not properly credentialed, the university is not in compliance with the HLC accreditation requirements, which calls into question the validity of IIAS INC's applications for state and federal education funding.

66. Considering the various ethical and legal implications the credentialing issue could have for the university, Ms. Olmsted brought this matter to Mr. Ray for guidance.

67. IIAS INC faced similar issues under the FCAs in the recently-resolved class action lawsuit and, as a high-ranking member of the organization, Mr. Ray knew or should have known of the potential exposure that could arise from allowing unqualified instructors to teach coursework at the university.

68. Rather than investigating Ms. Olmsted's concerns or even asking Ms. Olmsted, Dean of Academic Affairs, to take a closer look at the professional backgrounds of these faculty members, Mr. Ray dismissed the credentialing issue out of hand and suggested that Ms. Olmsted need not further concern herself with the credentials of these individuals.

69. Shortly thereafter, on January 12, 2016, Mr. Ray suspended Ms. Olmsted for alleged performance issues.

70. On January 20, 2016, Lea Marshall, Vice President of Human Resources, interviewed Ms. Olmsted as part of the disciplinary investigation initiated by Mr. Ray.

71. During this phone call, Ms. Olmsted reiterated her concerns regarding faculty members not having the necessary credentials.

72. Ms. Olmsted also reported her concern (which she had been investigating at the time of her termination) that students who enroll in certain "mid-quarter" classes were being improperly charged tuition for more class sessions than they were being scheduled to attend, which raised similar issues under the False Claims Acts and consumer agreement with respect to public tuition assistance fraud.

73. On January 27, 2016, Mr. Ray terminated Ms. Olmsted's employment, citing "significant gaps in [her] leadership and judgment" as the basis for her discharge.

74. At the time of her termination, Ms. Olmsted had no disciplinary record with EDMC.

75. Other male employees have had performance issues similar to those Mr. Ray referenced as an alleged basis for Ms. Olmsted's termination, but such employees were not fired.

76. Other employees who have not complained of improper credentialing and/or improper tuition charges have had performance issues similar to those Mr. Ray referenced as a basis for Ms. Olmsted's termination, but such employees were not fired.

77. On or about March 7, 2016, Mr. Ray executed a "Credentials Exceptions Record" for Mr. Kerr that acknowledges he does not have the proper academic credentials to teach his assigned coursework, but asserts that, based on Mr. Ray's review of Mr. Kerr's professional experience, Mr. Kerr is qualified to teach his assigned coursework.

78. On or about March 8, 2016, Mr. Ray executed a "Credentials Exceptions Record" for Mr. Caymaz that acknowledges he does not have the proper academic credentials to teach his assigned coursework, but asserts that, based on Mr. Ray's review of Mr. Caymaz's professional experience, Mr. Caymaz is qualified to teach his assigned coursework.

79. On information and belief, Mr. Ray's certifications in this regard are false.

## COUNT I – DISCRIMINATION UNDER TITLE VII

80. Ms. Olmsted herein re-alleges and re-affirms the allegations set forth in paragraphs 1-79, above.

81. Title VII makes it unlawful to discriminate against or harass any individual in the terms, conditions, or privileges of employment, on the basis of gender.

82. Ms. Olmsted is an "employee" as defined by 42 U.S.C. § 2000e-1(f).

83. Defendants are a covered "employer" as defined by 42 U.S.C. § 2000e-1(b).

84. By the conduct alleged herein, Defendants subjected Ms. Olmsted to gender discrimination in violation of Title VII.

WHEREFORE, Plaintiff, JILL OLMSTED, respectfully prays for entry of judgment in her favor and against Defendants, THE ILLINOIS INSTITUTE OF ART – SCHAUMBURG, INC., THE ILLINOIS INSTITUTE OF ART – SCHAUMBURG, LLC, EDUCATION MANAGEMENT LLC, and DREAM CENTER EDUCATION HOLDINGS, LLC, with respect to COUNT I and requests that this Honorable Court:

A. Declare that IIAS LLC and DCEH are liable for the conduct of IIAS INC and EDMC as successors in interest;

B. Declare that Defendants violated Plaintiff's rights under Title VII;

C. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

D. Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

E. Award Plaintiff compensatory damages;

F. Award Plaintiff punitive damages;

G. Award Plaintiff damages for emotional distress;

H. Award Plaintiff pre and post judgment interest;

I. Award Plaintiff reasonable attorneys' fees, costs, and disbursements; and

J. Order such other and further relief as this Court deems appropriate and just.

## COUNT II – COMMON LAW RETALIATORY DISCHARGE

85. Plaintiff herein re-alleges and re-affirms the allegations set forth in paragraphs 1-79, above.

86. Ms. Olmsted's discharge for reporting concerns regarding faculty credentials and improper tuition charges contradicts Illinois public policy.

87. Ms. Olmsted's discharge violated Illinois public policy that supports the rights of Illinois citizens to obtain benefits of a post-secondary education through federal and state funded programs.

88. Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070-1099d, allows students to obtain financial assistance for the purpose of attending post-secondary institutions. However, funding is only available to students who are attending eligible institutions.

89. To be considered an eligible institution, IIAS INC must sign and comply with a program participation agreement (PPA). The PPA requires IIAS INC to "meet the requirements established by . . . accrediting agencies or associations," *id*. § 1094(a)(21), and provide accurate information to these accrediting agencies.

90. The Illinois Monetary Award Program ("MAP") establishes similar requirements for obtaining public funding from the State of Illinois. *See* Ill. Adm. Code 23 § 2700.30(j).

91. IIAS INC breached its obligations under the HEA and MAP when it asserted to the HLC that its faculty members were properly qualified to teach their assigned coursework.

92. By breaching its obligations concerning applications for state and federal funding and misrepresenting the nature of its educational programs, IIAS INC may lose its eligibility to receive government funds. *See*, *e.g.*, 20 U.S.C § 1094(c)(3)(A).

93. As IIAS INC relied upon such misrepresentations when declaring its eligibility for state and federal funding, it is exposed to liability under the Illinois False Claims Act and federal False Claims Act.

94. The State of Illinois has a strong public policy in enforcing its laws and preventing fraud with respect to the issuance of public funds; a public policy that IIAS INC violated by terminating Ms. Olmsted.

95. Moreover, by enacting the Higher Education Loan Act ("HELA"), 110 ILCS 945/0.01 *et seq.*, the Illinois Legislature articulated the Illinois public policy of providing public funds for higher education to provide the fullest opportunity for recipients to learn and develop their intellectual and mental capacities and skills, which will allow funding recipients to provide greater contributions to the state and county.

96. By accepting public education funding but using it to hire unqualified individuals who cannot properly instruct students who are enrolled in certain classes, IIAS INC has defrauded both the student and the taxpayer.

97. IIAS INC violated the public policy underpinning the HELA by terminating Ms. Olmsted in response to her complaints of unqualified faculty members and shortened classroom instruction time for "mid-quarter" classes.

98. Accordingly, by the conduct alleged herein, Defendants retaliated against Ms. Olmsted for reporting conduct that violated the public policy of the State of Illinois.

WHEREFORE, Plaintiff, JILL OLMSTED, respectfully prays for entry of judgment in her favor and against Defendants, THE ILLINOIS INSTITUTE OF ART – SCHAUMBURG, INC., THE ILLINOIS INSTITUTE OF ART – SCHAUMBURG, LLC, EDUCATION MANAGEMENT LLC, and DREAM CENTER EDUCATION HOLDINGS, LLC, with respect to COUNT II and requests that this Honorable Court:

A. Declare that IIAS LLC and DCEH are liable for the conduct of IIAS INC and EDMC as successors in interest;

B. Declare that Defendants violated Plaintiff's rights under Illinois common law;

C. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

D. Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

E. Award Plaintiff compensatory damages;

F. Award Plaintiff punitive damages;

G. Award Plaintiff damages for emotional distress;

H. Award Plaintiff pre and post judgment interest; and

I. Order such other and further relief as this Court deems appropriate and just.

Dated: May 1, 2018

                                                Respectfully submitted by:

                                                /s/Gregory S. Dierdorf_____

                                                One of the attorneys for Plaintiff

Colleen M. McLaughlin   ARDC No: 3127466
Gregory S. Dierdorf       ARDC No: 6318078
Law Offices of Colleen M. McLaughlin
1751 S. Naperville Rd., Ste. 209
Wheaton, Illinois 60187
Telephone: (630) 221-0305
colleen@cmmc-employmentlaw.com
greg@cmmc-employmentlaw.com